IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | **UNDER SEAL** |
| v. | ) | |
| | ) | Criminal No. 1:13-MJ-380 |
| WILSON DANIEL PERALTA-BOCACHICA, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Beau Bourgeois, being duly sworn, depose and state the following:

**I.  Introduction**

1. I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been an agent for approximately 10 years. Since 2008, I have been assigned to a violent crime squad that investigates all types of violent crimes including but not limited to robbery, kidnapping, fugitive matters, extraterritorial investigations, carjacking, theft of government property, and assault on federal officers. I have received specialized training and have extensive experience conducting these types of investigations. I have been the affiant on numerous search and arrest warrants that have resulted in the arrest of subjects, the recovery of evidence in furtherance of investigations, and the resulting successful prosecution of several persons and cases.

2. The facts and information contained in this affidavit are based on personal knowledge on the investigation, on information conveyed to me by other law enforcement officials, and on my review of records, documents, and other physical evidence relevant to their activities.

1

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause for this application, I have not included every fact known to the government. Rather, I have included those facts I believe are needed to establish probable cause.

## II. Pertinent Statutes

4. I present this affidavit in support of a criminal complaint, charging Wilson Daniel Peralta-Bocachica with obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(1). Title 18, United States Code, Section 1512(c)(1) provides that whoever corruptly "alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding," shall be fined under this title or imprisoned not more than 20 years, or both.

5. Title 18, United States Code, Section 1515(a)(1) defines an "official proceeding" under Title 1512 to include, "a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury."

6. Title 18, United States Codes, Section 1512(f) (1) provides that, for the purposes of section 1512, "an official proceeding need not be pending or about to be instituted at the time of the offense."

7. Title 18, United States Code, Section 1512(g)(1) provides that in a prosecution for an offense under Section 1512, "no state of mind need be proved with respect to the circumstance – (1) that the official proceeding before a judge, court, magistrate judge, grand jury, or government agency is before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a Federal grand jury, or Federal Government agency."

8. Title 18, United States Code, Section 1512(h) provides that "[t]here is extraterritorial Federal jurisdiction over an offense under this section."

### III. Probable Cause and Details of the Investigation

9. On June 20, 2013, James T. Watson, a Special Agent (SA) with the U.S. Drug Enforcement Administration (DEA), was murdered in Bogota, Colombia. At the time, SA Watson was posted to the DEA office in Cartagena, Colombia,[1] but was working in an official capacity in Bogota, Colombia. At approximately 11:00 p.m., SA Watson entered into a taxi cab ("Taxi #1") in Parque 93 area of Bogota, Colombia. Law enforcement subsequently reviewed a surveillance tape that captured a second taxi ("Taxi #2") pulling up behind Taxi #1. This appeared to occur a short distance from where Watson originally entered Taxi #1. Taxi #1 then stopped. Upon stopping, two individuals appearing to wear vests were observed exiting the rear of Taxi #2 and entering the rear of the taxi containing Watson. Moments later, Watson was observed exiting the rear of Taxi #1 and running down the street out of camera range. A bystander who witnessed the event came to the aid of Watson, who collapsed on the street, and observed him to be bleeding from apparent stab wounds. The bystander called the police, who responded and transported Watson to the local hospital where he was pronounced dead. An autopsy determined that the cause of death was blood loss resulting from several stab wounds.

10. On or about June 24, 2013, United States Magistrate Judge Ivan D. Davis of the United States District Court for the Eastern District of Virginia issued arrest warrants for five individuals associated with the robbery and murder of Watson. They were Edwin Gerardo

---

[1] In an official diplomatic note (#1564) dated July 15, 2010, U.S. Embassy Bogota notified the Colombian Ministry of Foreign Affairs that James T. Watson was named as an Auxiliary Attaché for U.S. Mission Colombia. On July 21, 2010, the Colombian Ministry of Foreign Affairs responded with a diplomatic note conferring diplomatic status on Watson. Therefore, Watson's status as an Internationally Protected Person was established based on U.S. Embassy Bogota diplomatic note #1564 and Title 18, United States Code, Section 1116 (b)(4)(B) and (c)(1).

3

Figueroa Sepulveda ("Garcho"), Omar Fabian Valdes Gualtero ("Gordo"), Edgar Javier Bello Murillo (also known as "Payaso"), Hector Leonardo Lopez (also known as "Bavario"), and "Steven LNU." On or about June 25, 2013, pursuant to provisional arrest warrants provided to the Colombian authorities by the United States, all of the defendants, except "Steven LNU," were arrested by Colombian authorities and interviewed by United States law enforcement officials. During post-arrest interviews with U.S. law enforcement officials, all four of the defendants that were arrested provided statements to investigators implicating themselves in the robbery and murder of Watson.

11. On or about June 27, 2013, United States Magistrate Judge Ivan D. Davis of the United States District Court for the Eastern District of Virginia issued arrest warrants for five individuals associated with the robbery and murder of Watson. They were Edwin Gerardo Figueroa Sepulveda ("Garcho"), Omar Fabian Valdes Gualtero ("Gordo"), Edgar Javier Bello Murillo (also known as "Payaso"), Hector Leonardo Lopez (also known as "Bavario"), and "Steven LNU." On or about June 25, 2013, pursuant to provisional arrest warrants provided to the Colombian authorities by the United States, all of the defendants, except "Steven LNU," were arrested by Colombian authorities and interviewed by United States law enforcement officials. During post-arrest interviews with U.S. law enforcement officials, all four of the defendants that were arrested provided statements to investigators implicating themselves in the robbery and murder of Watson.

12. As described below, information from a confidential source and audio intercepts of Wilson Daniel Peralta Bocachica's ("Wilson") telephone establish that after Wilson learned of Watson's murder, Wilson assisted Payaso and others in cleaning out the victim's blood from the

taxi where Watson was stabbed and Wilson directed another individual to burn the rags used to clean the taxi.

### A. Information Obtained from CS1

13. Starting on June 21, 2013 and continuing through the present, law enforcement investigators have met with a confidential source ("CS1") who has provided information about the robbery and murder of Watson. During his first meeting with law enforcement, CS1 advised that he learned of Watson's murder on the morning of Friday, June 21, 2013 and that he had information about the two taxi cabs that were used during the commission of the crime. CS1 explained that he was a cab driver and the taxis used in the murder were the same taxi cabs that he and other individuals rented and drove from time to time. CS1 explained that he and another man he knew as "Mauricio" sometimes rented and shared Taxi #2. CS1 further explained that two individuals named Payaso and Wilson (who was subsequently identified by law enforcement as Wilson Daniel Peralta Bocachica) sometimes rented and shared Taxi #1.

14. CS1 told law enforcement that the first time he had a conversation with Wilson about the taxis was on or about June 23, 2013 at approximately 5:30 a.m. CS1 explained that early on June 23, 2013, CS1 saw Wilson, and Wilson told CS1 that on June 21, 2013 at about 3:00 a.m., "Payaso" brought in their taxi with blood in the back seat area as well as on the door panels. Wilson sarcastically told CS1 that others, including himself, were having to clean up after Payaso's mess.

15. CS1 told law enforcement that later that morning, at approximately 7:30 a.m., Wilson called CS1. During the telephone call, Wilson asked CS1 if he would exchange the back seat of the taxi cab that Wilson had with the back seat of CS1's brother-in-law's car that had the

same size seats. CS1 did not commit to making the exchange and after the telephone call ended, CS1 contacted law enforcement to advise them of Wilson's request.

16. On or about June 23, 2013, at approximately 9:30 a.m., at the direction of law enforcement, CS1 agreed to meet with Wilson to exchange the seats. CS1 traveled to Wilson's house where he observed Taxi #1 parked nearby. CS1 observed two individuals cleaning the seats. CS1 also saw seat covers hanging out to dry. Thereafter, CS1 met with Wilson and Wilson gave CS1 the back seats of Taxi #1.

### B. Information Obtained from Judicially Authorized Interception of Wilson's Telephone

17. On the morning of June 24, 2013, following the murder of Watson, Colombian news had extensive media coverage of this event. Included in this coverage was video footage of Watson's murder described in Paragraph 8 above. U.S. law enforcement officials are aware that the coverage identified the victim as a U.S. citizen and a DEA Special Agent.

18. During the course of the investigation, Colombian law enforcement authorities obtained judicial authority to intercept Wilson's telephone. Copies of the audio recording were provided to U.S. law enforcement. The following is information obtained from those intercepts as well as information provided by law enforcement relating to those intercepts:[2]

- On or about June 24, 2013, at approximately 9:00 a.m., Wilson spoke to CS1 and told CS1 that he should watch the news. Wilson commented that he had put hands on both cars. Based on their training, experience, and knowledge of the investigation, law enforcement officers believe Wilson was referring to Taxi #1

---

[2] The following information is based on draft, unofficial translations of the telephone calls which were conducted in Spanish.

6

and Taxi #2. Wilson also told CS1 that he was going to wash the cars and that they could meet later.

- On or about June 24, 2013, at approximately 12:50 p.m., Wilson spoke to an unidentified male. During the conversation, Wilson told the male caller that "they" are looking for the murderer of a DEA agent. Wilson also admitted that he was driving a car that was involved. Wilson explained that he was going to bring the cars involved to the owner. The male caller responded that if Wilson needed a lawyer, he could help him get one.

- On or about June 24, 2013, at approximately 12:54 p.m., Wilson spoke to CS1 and told CS1 that "they are looking for us" because the car was shown in the video and the plates could be seen. Based on their training, experience, and knowledge of the investigation, law enforcement understand that Wilson was telling CS1 that law enforcement was looking for him and others involved because the video being shown on the news identified the vehicles involved in Watson's murder and Wilson was in possession of one of the vehicles.

- On or about June 24, 2013, at approximately 2:00 p.m., Wilson spoke to an unidentified male. During the telephone call, Wilson told the caller that they were contaminated and that they needed to be "burned." The caller asked if Wilson was talking about the rags with blood on them. Wilson is heard gasping. The caller then indicated that he would get rid of them.

C. **Evidence Obtained from Taxi #1**

19.     On or about the afternoon of June 24, 2013, Wilson and Mauricio drove Taxi #1 and Taxi #2 to the Colombian National Police station in Bogota, Colombia to turn in the cabs.

20. An FBI Evidence Response Team helped to process the two cabs turned in by Wilson and Mauricio. Initial results indicate that one of the cabs had blood stains on the floor mat.

### III. Conclusion

21. Based upon the facts set forth above, I respectfully submit there is probable cause to find that, on or about June 26, 2013, obstructed justice by seeking to destroy evidence relating to the murder of Special Agent Watson with the intent to impair the evidence's integrity or availability for use in an official proceeding, in violation of Title 18, United States Code, Section 1512(c)(1).

22. I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Respectfully submitted,

_____/s/ Beau B_____
SA Beau Bourgeois
Washington Field Office
Violent Crimes Task Force
Federal Bureau of Investigation

Subscribed and sworn to before me
this 28th day of June 2013.

_____/s/_____
Theresa Carroll Buchanan
United States Magistrate Judge

8