IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                           )<br>)<br>WILSON DANIEL PERALTA-BOCACHICA, )<br>)<br>Defendant.                                    )<br>) | <br><br>CRIMINAL NO. 1:13-CR-310<br><br>The Honorable Gerald Bruce Lee<br><br>Sentencing Date: February 18, 2015<br> |

**MOTION FOR ONE LEVEL REDUCTION PURSUANT TO U.S.S.G § 3E1.1(b) AND POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, in accord with the United States Sentencing Commission, *Guidelines Manual*, § 6A1.2 and the policy of this Court, files its position on the sentencing of the defendant, WILSON DANIEL PERALTA-BOCACHICA. The United States moves for a one-level reduction of the defendant's Sentencing Guidelines level pursuant to U.S.S.G § 3E1.1(b) in recognition of the defendant's timely guilty plea. The government has reviewed the Presentence Investigation Report ("PSR") and concurs with the findings of the Probation Office, including the determination that the applicable Sentencing Guidelines range is 70-87 months' imprisonment. Consistent with the terms of the Plea Agreement in this case, and in consideration of the role the defendant played in this case, the United States respectfully submits that a sentence of 60 months' of incarceration is appropriate and accounts for each of the factors set forth in Title 18, United States Code, Section 3553(a).

1

I.  **Procedural Background**

On December 12, 2014, the defendant pleaded guilty pursuant to a Plea Agreement to Count Seven of the indictment charging him with Obstruction of an Official Proceeding, in violation of Title 18, United States Code, Section 1512(c). The Plea Agreement provided, in relevant part, that the parties agree that the defendant's sentence shall be imposed pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The Plea Agreement further provided that the parties agreed that a sentence of not more than 60 months' incarceration is an appropriate disposition of this case.

II. **Factual Background**

The following is a brief summary of the facts surrounding DEA Special Agent James "Terry" Watson's murder, including information about the victim and the defendant's involvement in destroying evidence relating to the murder.

A. **The Victim, Special Agent James "Terry" Watson**

> **"Terry was on the front line of stopping drugs from getting into our country and to our children." Paul Watson, Victim Impact Statement.**

Special Agent Terry Watson was a dedicated and long-standing public servant who devoted his entire adult life to protecting the public and the citizens of the United States. Prior to joining the DEA, Special Agent Terry Watson worked for the Richland Parish, Louisiana Sheriff's Department, the U.S. Army National Guard and the U.S. Marshal's service. Thereafter, he joined the DEA. During his 13 years with the DEA, Special Agent Terry Watson stood on the front lines combating drugs, guns, and violence that threaten our country every day. He volunteered for dangerous assignments that took him all over the world including Honduras

Haiti, Panama, Guatemala, and Colombia. In addition, he was deployed on three separate occasions to Afghanistan.

In July 2010, Special Agent Terry Watson was assigned to DEA's Cartagena, Colombia Resident Office. In his position, he was also designated as an Assistant Attaché for the United States and was an internationally protected person. At time of his death, he was working on a number of large-scale narco-trafficking matters, including one case that was resolved shortly after his death that involved the seizure of approximately 20,000 kilograms of cocaine, 15 go-fast vessels, and the arrest of approximately 50 individuals.

As his colleagues have described, he was the type of agent who was the first to arrive in the morning and the last to leave at night. He was hard working, smart, and humble – he was a leader and a mentor to many of his fellow agents. Not surprisingly, the night of his death, Special Agent Terry Watson was busy throughout dinner talking and texting with his colleagues to keep track of an ongoing DEA operation.

At the time of his death, he was a 42-year-old, recently married man, who was a 13-year veteran of the DEA. He lived with his wife of four months, Fadia De La Rosa Watson. He was the youngest son of Henrietta and Paul Watson and brother to Scott Watson. As his wife and parents have stated, the loss of Terry has been devastating, it has caused countless sleepless nights wrought with nightmares of Terry's murder, and their existence does not have space for all the pain they still feel about Terry's death. It should also be noted that the death of the victim has been felt not only by his family, but has reverberated throughout the DEA family, the United States Embassy in Bogota, Colombia, and the law enforcement community.

### B. The Kidnapping and Robbery of Special Agent James "Terry" Watson

On or about June 20, 2013, the co-defendants in this case, including Julio Estiven Gracia Ramirez ("Ramirez"), Omar Fabian Valdes Gualtero ("Valdes Gualtero"), Hector Leonardo Lopez ("Lopez"), Edwin Gerado Figueroa Sepulveda ("Figueroa Sepulveda"), and Edgar Javier Bello Murillo ("Bello Murillo") met to coordinate and conduct millionaire rides, which involved the use of taxi cabs to pick up, kidnap, rob, and assault victims in Bogota, Colombia. Once the group met on the evening of June 20, they quickly proceeded to circle the city looking for potential victims. The second taxi encountered some mechanical issues and was unavailable for use in the robbery that the group intended to conduct. Thereafter, the rest of the coconspirators, continued with the plan but with two taxis rather than three.

At approximately 11:00 p.m., Special Agent Terry Watson left a restaurant in Bogota, where he had been dining with DEA and international law enforcement colleagues. He hailed a taxi ("Taxi #1") in the Parque 93 area of Bogota, a popular and affluent neighborhood known for high-end dining and shopping establishments. Ramirez drove Taxi #1 and selected Special Agent Watson as a target for a "millionaire's ride" robbery. Once the victim entered Taxi #1, Ramirez engaged the victim in conversation in Spanish and determined that Special Agent Terry Watson was seeking a ride to the Marriott Hotel in Bogota. As soon as Taxi #1 began to travel, a second taxi ("Taxi #2"), driven by Lopez, pulled up behind Taxi #1. Figueroa Sepulveda, Bello Murillo, and Valdes Gualtero were riding in Taxi #2.

After a short drive, Ramirez alerted the other defendants that Special Agent Terry Watson was to be their next robbery victim. As previously agreed, Ramirez alerted his co-defendants by pumping the brakes of his taxi to act as if it were experiencing engine trouble. Upon receiving the signal, Lopez confirmed his understanding of the plan by flashing the headlights of his car.

4

Taxi #1 then came to a stop, and Taxi #2 pulled up directly behind it. This defendant and Bello Murillo got out of the back seat of Taxi #2 and got into the back seat of Taxi #1, one on each side of Special Agent Terry Watson. The defendant used a stun gun several times to attempt to incapacitate Special Agent Terry Watson. Special Agent Terry Watson struggled. During the struggle, Defendant Bello Murillo stabbed the victim several times with a knife.

Special Agent Terry Watson was able to break free, but collapsed a short distance from the crime scene. Colombian National Police officers arrived several minutes later. The police put the victim in their vehicle and took him to the hospital, where he was pronounced dead shortly thereafter. The cause of Special Agent Terry Watson's death was blood loss as a result of multiple stab wounds. The manner of death was homicide.

### C. The Victim's Injuries

During the kidnapping and robbery, the victim was hit with fists, shocked with a taser, and stabbed a total of four times. The victim was shocked with the taser approximately three to six times. Thereafter he was stabbed in the torso. At least two of his wounds were fatal, but it took him approximately an hour before he succumbed to his injuries. He was able to escape from the taxi and run approximately a half a block before he collapsed. He was able to speak initially, but by the time he was evaluated by emergency room personnel they were not able to detect a blood pressure, and he soon succumbed to his injuries, which caused him to lose almost his entire blood volume.

### D. The Defendant's Affiliation with the Members of the Conspiracy Who Murdered Special Agent Watson and the Defendant's Role in Destroying Evidence of the Murder

The defendant's role in attempting to cover-up the crime was not small: he cleaned the victim's blood from the back seat of his taxi, he swapped the back seats of his taxi for the seats

5

of a friend's taxi (who, unbeknownst to the defendant was working with Colombian law enforcement officials), and he asked another friend to go to his house to burn the bloody rags that he used to clean his taxi. The defendant took all of these steps after learning that his taxi had been involved in the murder of Special Agent Watson and with knowledge that the blood in his taxi was the victim's.

As background, the defendant was a taxi driver in Bogota, Colombia. He rented a taxi and shared the taxi with defendant Bello Murillo. The taxi the defendants shared was the taxi in which Special Agent Watson was stabbed. Typically, the defendant drove the day shift and Bello Murillo drove the night shift.

The defendant had worked during the day of Thursday, June 20, 2013, and planned to work again during the day on Friday, June 21. At approximately 3:30 a.m. on June 21, defendant Bello Murillo dropped off the shared taxi at the defendant Peralta-Bocachica's home. At the time the taxi was dropped off, there is no indication that it had been cleaned and, therefore, contained the victim's blood on the back seats, the floor mats, and the inside of the rear door. Notably, according to the defendant Figueroa Sepulveda, the taxi in which Special Agent was stabbed in was very bloody. Specifically, Figueroa Sepulveda stated that the "seat and the floor and everything…full of blood."[1]

As the defendant admitted to law enforcement, he learned of Special Agent Watson's murder on the morning of June 21 while listening to a radio program. The defendant purportedly worked all day Friday. At some point, Bello Murillo called to say that he was leaving town and so he would not be picking up the cab for his night shift. Accordingly, the defendant kept

---

[1] Law enforcement facilitated undercover meetings and provided audio recording devices to a Confidential Source (CS1) who then met with and recorded conversations with defendant Figueroa Sepulveda and Valdes Gualtero (date of recording: June 23, 2014).

possession of the car. Although he had the taxi, the defendant did not drive it on Saturday, June 22, due to Colombian laws that restrict the operation of taxis on certain days to help prevent traffic congestion.

Importantly, information about the murder was widely reported in the Colombian media beginning on the morning of June 21, and the crime continued to be a high-profile matter that was reported on consistently for the days and weeks that followed. Within days, video surveillance images of the attack and the victim fleeing from the taxi were shown on numerous Colombian news programs. In fact, the video surveillance images showed the taxi that was then in the possession of the defendant. The defendant even admitted that at some point his own brother told him that it appeared that his taxi was on the news and appeared to be the taxi that was used in the murder.

On Sunday, June 23, 2014, the defendant took the taxi to a local car wash and cleaned the victim's blood from the backseat. After he was arrested and when questioned by law enforcement, the defendant twice lied and claimed that he thought the blood in the backseat was the result of a cut defendant Bello Murillo had sustained several days earlier; however, the defendant later recanted and stated he knew that there was more blood than could have been from Bello Murillo's cut and he suspected it was Special Agent's Watson's blood in the backseat.

At the car wash with the defendant were the co-defendant Lopez and defendant Bello Murillo's uncle -- both of them assisted with the cleaning of the vehicle. Despite their presence, the defendant claims they did not talk about the murder. (The defendant did admit that it was unusual for both Lopez and Bello Murillo's uncle to be at the car wash and to assist him with cleaning the cab.) The defendant thoroughly cleaned the backseat of the taxi and the floor mats –

7

including physically removing the back seats of the car to scrub them down – all of which was captured on video.

In addition to cleaning the car, the defendant attempted to get rid of the seats. Also on Sunday, June 23, a Confidential Source (CS2) reported to Colombia law enforcement that the defendant called him around 9:00 a.m. and asked him to swap out the rear seats of his taxi for the rear seat of CS2's taxi. CS2 told the defendant he would think about it and then contacted Colombian authorities. With the assistance of, and at the direction of Colombian authorities, CS2 met with Peralta-Bocachica later that morning to swap out the seats. When CS2 arrived at the agreed meeting location, CS2 took the seats provided by Peralta-Bocachica and then traveled to the Colombian authorities where the authorities took custody of the seats. The defendant, however, now claims that CS2 decided to switch the seats on his own and without the defendant's knowledge.

Finally, the defendant instructed a third party to burn the rags he used to clean the seats. On Monday, June 24, 2013, the defendant decided to turn in his taxi to Colombian law enforcement officials. On his way to the station, he called a friend to ask him to go get the rags that "smell really bad" and throw them away or set them on fire. Colombia law enforcement officials intercepted and recorded that telephone call.[2] The following is an English translation of the transcript of the call:[3]

---

[2] Colombian law enforcement officials obtained judicial approval to intercept the telephone number belonging to the defendant. Colombian law enforcement officials provided an official copy of the intercepted calls pursuant to a formal request from U.S. law enforcement authorities.
[3] The telephone translation in this filing was made by a Court-approved translator that was hired to prepare certified translations in preparation for trial. Copies of the wire intercepts and the translations were provided to defense counsel during the discovery process.

**Defendant**: I….it's that I needed that…those rags that I asked Mari the favor of leaving them there for me. It's because those rags smell really bad, for her to throw them away.

**Unidentified Male (UM)**: I handed them up, dude, but then…

**Defendant**: No, those rags are very bad off, so they have to, have to, like…or throw them away, or hey, set them on fire.

**UM**: So, what ended up happening? Did you go out and about?

**Defendant**: It smells, it smells really bad. Uh, man, go…uh no, I'm here working. So, call me if anything comes up. We'll talk in a little while.

**UM**: But you didn't, you didn't go to turn the car in or anything?

**Defendant**: We're arriving, we're arrive.

**UM**: God bless you. I'm here for you if anything comes up.

**Defendant**: Hello, hello…call over there to Michael and tell him for them to go back, as a favor for me, because that's pervading over there now, over there in the bedroom, in the room in the apartment.

**UM**: What do you mean, if those are the ones that had the blood on them or what?

**Defendant**: Oh, brother!

**UM**: Okay, I'll…I know. I'll tell him to throw them away then.

**Defendant**: Okay.

Notably, when asked by law enforcement about the burning of the rags, the defendant simply claimed that it was not unusual for him to burn rags and other trash.

### E. History and Characteristics of the Defendant

As outlined in the government's 404(b) Motion (*see* Dkt. No. 138), law enforcement located a prior victim who identified the defendant Peralta-Bocachica as one of his assailants.

9

The victim identified the defendant from a photo array that contained approximately 50 photographs (including photographs of other co-defendants). The victim only identified two individuals: the defendant and co-defendant Bello Murillo (the person with whom the defendant shared the taxi). The following is summary of this prior victim's assault:

On June 14, 2013, "Victim E" was picked up at Carrera 12 and Calle 83, in the Zona T area, Bogota, Colombia, after finishing dinner at approximately 11:15 p.m. A short distance later, the driver stopped the cab, and two individuals entered the taxi through the rear passenger doors. Victim E identified the defendant Peralta-Bocachica and defendant Bello Murillo as the individuals that entered the taxi. The assailants instructed the victim to give them his bank cards, PIN number, and phone. A third assailant approached the vehicle, took the bank cards, and left in another taxi. A phone rang, and the assailants were told that the PIN number did not work. The victim advised that it might not work because he took money out earlier that evening. The assailants then held the victim captive and drove him around until nearly 1:00 a.m. in the hope that the bank card would work after 12:00 a.m. The victim advised law enforcement that defendant Peralta-Bocachica got in the back seat with him and sat next to him during the nearly 2 hours that he was held. The victim stated that when Peralta-Bocachica got in the taxi, he immediately began to hit the victim in the head, then looked for his wallet, as he told him to keep his head down. The victim further advised that it was Bello Murillo who appeared to have something sharp in his hand.

### III.   Sentencing Standards

Although the Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 125 S. Ct. 738, 767 (2005). "[A] district court shall first calculate (after making the appropriate findings of

fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

### IV.   Sentencing Guidelines Calculation

The United States concurs in the Probation Office's Sentencing Guidelines calculation. The Base Offense Level is 30. U.S.S.G. § 2J1.2(a). The defendant has demonstrated acceptance of responsibility and has assisted law enforcement authorities in the investigation by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, his offense level is decreased by a total of 3 points. U.S.S.G. § 3E1.1(a) and (b). The defendant's criminal history is a Category I. Accordingly, the Guidelines range is 70-87 months' imprisonment.

### V.   Statutory Sentencing Factors

Consistent with the terms of the Plea Agreement, the government submits that a sentence of 60 months' imprisonment would be sufficient, but not greater than necessary, to account for the factors set forth in Title 18, United States Code, Section 3553(a), including: (A) the nature and circumstances of the offense and the history and characteristics of the defendant, and (B) the need to provide a just punishment for the crime and the need to afford adequate deterrence for such conduct.

### A. A Sentence of 60 Months' Incarceration is Reasonable and Appropriate Given the Nature and Circumstance of the Offense and the History and Characteristics of the Defendant.

There is no more serious crime than the taking of a human life. Despite the gravity of the crime – the murder of another human being – and despite knowing that the victim in this case was a U.S. law enforcement officer, the defendant took multiple steps to hide evidence of the crime from Colombian and U.S. law enforcement officials. The defendant cleaned the victim's blood from his car. He physically removed the seats and the floor mats to scrub them down. Then, when that wasn't enough, he called a friend and asked him to take the seats and switch them. Finally, once he knew that the police had identified his taxi as the taxi that was involved in the case, the defendant stopped and made a call to another friend and asked him to burn the bloody rags that he had used to clean the taxi. Finally, when the defendant turned the cab over to the Colombian National Police, he made no mention that he had altered or destroyed evidence. The defendant knew about the victim's murder within hours of the event and he knew his taxi contained evidence of that murder when he took each step to get rid of the evidence. These were deliberate steps that could have undermined or prevented the successful prosecution of the codefendants had it not been for the information provided by other citizens who decided to come forward and assist law enforcement in the investigation.

When considering the defendant's role in the offense, the Court should conclude that the defendant's actions make clear that this individual deliberately took steps to hide evidence of the murder. Steps that were taken over a series of days. Therefore, the recommended sentence reflects the circumstances of the offense and the role that the defendant played.

Further, when considering the history and characteristics of the defendant, the Court should take into consideration the identification of the defendant as an assailant in a prior

"millionaire's ride."  In that prior assault, the victim spent approximately 2 hours with the defendant.  The defendant was violent during the assault – hitting the victim multiple times in the head and he threatened to kill the victim.  That assault occurred less than a week prior to Special Agent Watson's murder and the victim identified the defendant from a photo array of approximately 50 other pictures.  The co-assailant in that case was Bello Murillo – the person who shared the taxi with the defendant and the person who most benefited from the defendant's actions to remove the evidence of Special Agent Watson's murder.  Understanding the defendant's relationship to and connection with Bello Murillo provides context to the defendant's actions surrounding the murder of Special Agent Watson and provides insight into the history and chacterics of the defendant.

### B. A Sentence of 60 Months' Incarceration is a Just Punishment and Provides Adequate Deterrence

A sentence of 60 months will deter the defendant and others from similar acts and is just punishment for the offense.  Prior to Special Agent Terry Watson's murder, "millionaire ride" robberies were ubiquitous in Bogota.  The term "paseo millionaire" was a common term and U.S. employees traveling to the United States were briefed on them as a possible threat.  The victim's murder in this case placed these types of crimes on the front page of the newspapers and television reports for weeks.  Indeed, this case continues to generate substantial interest from the Colombia media.

Punishment of a person who took steps to hide the crime is as important as punishing the people who committed the crime.  Although different sentences are warranted, a substantial sentence for a defendant who spent days getting rid of evidence is necessary to deter others from committing this type of offense, whatever their motivation may be.  In this instance, the

13

defendant may claim that he simply panicked (even though the deliberate actions of the defendant suggest otherwise). Nevertheless, the defendant's actions were designed to undermine a known investigation and a sentence of 60 months' will send a clear message to criminals at home or in Colombia that harsh sentences await if they purposefully (or in a panic) destroy evidence of a crime.

**VI.  Conclusion**

For the reasons set forth above, the United States respectfully submits that a sentence of 60 months' incarceration is warranted and just.

Respectfully submitted,

Dana J. Boente  
United States Attorney

Leslie R. Caldwell  
Assistant Attorney General  
Criminal Division

By:    /s/                                          
Michael P. Ben'Ary  
Assistant United States Attorney  
United States Attorney's Office  
2100 Jamieson Avenue  
Alexandria, VA 22314  
Phone: (703) 299-3700  
Fax: (703) 299-3980  
michael.ben'ary2@usdoj.gov  

By:    /s/                                          
Stacey Luck  
Special Counsel  
Human Rights and Special Prosecutions Section  
Criminal Division, U.S. Department of Justice  
1301 New York Ave., N.W.  
Washington, D.C. 20005  
Phone: 202-514-5650  
stacey.luck@usdoj.gov  
Facsimile: (703) 549-5201

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 11th day of February, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the counsel of record.

                                        /s/
                                    Stacey Luck
                                    Special Counsel
                                    Human Rights and Special Prosecutions Section
                                    Criminal Division
                                    U.S. Department of Justice
                                    1301 New York Ave.
                                    (202) 514-5650
                                    Stacey.luck@usdoj.gov